Carol Rae WRIGHT, Bonnie Lynn Wright, et al., Plaintiffs,

v.

Daniel Paul NEWMAN, John Scheall, et al., Defendants,

v.

MISSION INSURANCE COMPANY, Garnishee.

No. 82–5090–CV–SW–0.

United States District Court, W.D. Missouri, Southwestern Division.

Oct. 5, 1984.

As Amended Oct. 19, 1984.

Thomas Strong, Mathew W. Placzek, Strong, Placzek & Wooddell, Springfield, Mo., for plaintiffs.

Spencer J. Brown, Dale L. Beckerman, Deacy & Deacy, Kansas City, Mo., for garnishee.

## MEMORANDUM OPINION AND JUDGMENT

ROSS T. ROBERTS, District Judge.

This is a garnishment proceeding, in aid of execution upon three final judgments totaling $5,775,000 which the court previously entered in favor of the plaintiffs in this matter. At the conclusion of a trial on the merits, the jury empanelled to hear the present aspect of the case returned special verdicts in accordance with Fed.R.Civ.P. 49(a), and the entry of a judgment now awaits only the court's disposition of the essential legal issues presented, as well as any material questions of fact not fully resolved by the jury's findings.

## I.

## GENERAL BACKGROUND

The controversy before the court has its roots in a fatal automobile accident which occurred on the evening of March 4, 1980, near the intersection of U.S. Highway 71 and State Highway 76 in McDonald County, Missouri. Since the facts of that tragedy have been detailed in three prior opinions in this case,[1] it is sufficient for present purposes to note only that the accident—in which Tina Wright was killed and Carol and Bonnie Wright severely injured—occurred when an unoccupied Pontiac Firebird, being towed behind a Ford pickup truck driven by defendant Daniel Paul Newman, broke loose from the towing apparatus, crossed the center line of the highway and struck the plaintiffs' auto head-on.

---

1. *See* the final judgment of this court entered February 17, 1983, and the Order of the Honorable H. Franklin Waters, found at 539 F.Supp. 1331 (W.D.Ark.1982), the latter reversed in part by the mandate of the Eighth Circuit, 735 F.2d 1073 (8th Cir.1984).

At the time of the collision, Newman was employed by John Scheall who, doing business as Scheall Driveaway System, had been engaged under contract by Ford Motor Credit Co. (FMCC) to transport the recently repossessed Ford pickup from Fayetteville, Arkansas, to Phil Long Ford, Inc., in Denver, Colorado. The Pontiac automobile had been repossessed by General Motors Acceptance Corp. (GMAC), and under an agreement similar to that with FMCC was to be transported by Scheall from Fort Smith, Arkansas, to a destination in Arizona.

Within weeks of the accident, the plaintiffs brought this diversity action in the Western District of Arkansas, ultimately joining as defendants the driver, Daniel Paul Newman, his employer, John Scheall, American Auto Shippers, Inc., an entity under whose certificate of authority Scheall operated as a carrier in interstate commerce, and those persons allegedly having an interest in the subject vehicles, GMAC, FMCC, and Phil Long Ford, Inc.[2] On May 13, 1982, the court granted summary judgment in favor of GMAC, FMCC and Phil Long Ford, Inc., and upon a subsequent determination that the remaining matters could be more conveniently litigated in the Western District of Missouri, transferred the case to this court by order dated September 21, 1982.[3]

On December 15, 1982, plaintiffs and defendants Newman and Scheall entered into a contract of partial settlement whereby Commercial Union Insurance Co. paid to plaintiffs the sum of $300,000, representing the policy limits of insurance coverage afforded those defendants by virtue of Scheall's association with American Auto

Shippers, Inc. For their part, the plaintiffs agreed to forego satisfaction of any subsequently-obtained judgments from the personal assets of Newman and Scheall,[4] and dismissed without prejudice their claims against American Auto Shippers.

On February 18, 1983, the matter proceeded to trial upon the claims against Newman and Scheall, who had executed written waivers of appearance and right to jury. After two days of testimony concerning plaintiffs' claims, the court—sitting without a jury—entered judgment in favor of the plaintiffs, and against defendants Newman and Scheall jointly and severally, in the aggregate amount of $5,775,000. No relief having been sought with respect to these judgments, they are now for all purposes final.

Shortly thereafter, the plaintiffs served notice and summons of garnishment upon Mission Insurance Co. ("Mission"), in an attempt to satisfy the aforesaid judgments from a Mission insurance policy allegedly affording further coverage for the accident. After joinder of the issues under the procedures of Mo.Sup.Ct.R. 90.13, the denial of separate motions to quash and for summary judgment filed by the garnishee, and the entry of an order permitting plaintiffs to dismiss the garnishment as to judgment debtor Daniel Newman, the matter proceeded to the above-mentioned jury trial.

## A.

### *Events Preceding Issuance of the Mission Policy*

Defendant John Scheall, d/b/a Scheall Driveway Services, was engaged as a com-

---

2. In connection with the underlying action, this court as well as the Western District of Arkansas has previously determined there to be complete diversity of citizenship between the Arkansas plaintiffs and the parties defendant, and therefore subject matter jurisdiction under 28 U.S.C. § 1332. Since Mission Insurance Co. is a California corporation, having its principal place of business in that state, and the amount in controversy here clearly exceeds $10,000, this court likewise has diversity jurisdiction over these proceedings in aid of execution under Fed.R.Civ.P. 69.

3. By the mandate of the Eighth Circuit, referred to in footnote 1. *supra,* the Order of Summary Judgment has been reversed with regard to FMCC and those claims remanded to this court for renewed litigation.

4. This agreement is denominated a "contract pursuant to Section 537.065 VAMS." Mo.Rev. Stat. § 537.065 allows persons having an unliquidated claim for damages against a tort feasor to limit execution upon any subsequently obtained judgment to a specified asset, or fund of insurance.

mon carrier in the business of transporting vehicles for hire to various places in the United States. As the term "driveaway" would suggest, the vehicles were transported under their own power or "driven" from place to place, although frequently another, driverless automobile might be towed behind the driven automobile. The drivers of these vehicles were either "professionals" —persons holding chauffeur's licenses whom Scheall employed part time—or were casual applicants who received no compensation but found the arrangement a convenient means of personal travel. While the driveaway service was apparently available to anyone, at least a substantial percentage of Scheall's customers were banks and retail finance companies who used the service for transporting repossessed vehicles, such as the two automobiles concerned in this case.

Scheall had his offices and principal place of business in Denver, Colorado, where he employed one full-time employee, Bill Cook, and one part-time employee, Tony Tobias. Scheall's authority to operate as a carrier in interstate commerce came from American Auto Shippers, Inc., of New York, New York, for whom he was agent. By virtue of this agency, Scheall and his employees received public liability coverage under a policy written by Commercial Union Insurance Co., having limits of $300,000 for bodily injury and $15,000 for property loss. The testimony was to the effect that these coverage limits represented the minimum insurance requirements of the Interstate Commerce Commission.

In November, 1979, Scheall directed his employee Cook to obtain liability insurance coverage in addition to that afforded by Commercial Union. Scheall testified that the growth of his business, and his long-standing concern that the ICC minimums were insufficient, motivated him to seek this increased insurance coverage, specifically $3,000,000 liability and $40,000 collision limits. The evidence indicates that Scheall was at the same time in the process of negotiating a contract with one Smith Energy Corp. to move certain of the latter's oil drilling rigs, and would also need single-trip collision insurance in the amount of $550,000 to cover the value of that equipment. In essentially the same time frame, Scheall was also contemplating the transport of certain busses for the Denver Regional Transportation District ("RTD"), and recalled that additional insurance might have been required for this prospective customer as well.

Since Scheall had not previously dealt with any commercial insurance agent or broker, Cook resorted to the yellow pages of the telephone book. After making three or four other calls, he contacted Denver insurance broker Richard Mooney, who operated in corporate form under the name "Insurance Technology Corp." Cook advised Mooney of Scheall's insurance requirements, i.e., $3,000,000 liability, $40,000 general collision coverage and $550,000 collision coverage for the drilling rigs. Mooney responded that he would "shop around" for the desired insurance.

Sometime later, Mooney met with Scheall at the latter's office. Mooney's recollection of this initial meeting—a recollection not shared by Scheall—was that Scheall announced his intention to start a new driveaway service for commercial vehicles, either as a separate entity or a division of his existing driveaway business. It was in respect of this "commercial" operation, according to Mooney, that Scheall desired the additional insurance, since he already had insurance for his regular driveaway operations through his "parent" or "franchiser" [sic]. The meeting concluded, and Mooney had no further contact with Scheall until he returned to Scheall's office on November 30, 1979, at which time they completed a written application for insurance with Guaranty National Insurance Co. ("Guaranty").

The testimony concerning that second meeting diverged widely. According to Mooney, Scheall advised him that the drivers to be covered by the new insurance were only three in number, specifically Scheall himself, the office manager, Bill Cook, and one Leonard Weaver. Mooney

also recalled Scheall's statement to the effect that the operation would involve an average of only eight to ten trips per month with a maximum of 20 trips per month possible. Scheall, in contrast, and to a degree with the supporting testimony of Cook, testified that it had been his wish to obtain increased insurance for his *entire* driveaway operation, and since there were necessarily many potential drivers involved, some of whom might be hired at a moment's notice, it was then impossible to list them all. Scheall explained that he nevertheless gave Mooney the three names indicated, upon the latter's insistence that "some" drivers must be listed. It is undisputed, in any event, that only the three persons identified by Mooney were in fact listed on the application.

Although this dispute was further magnified by Mooney's testimony to the effect that he also advised Scheall that *only* the three drivers listed would be covered under the new insurance policy, it requires no further exploration here, since the jury has for our purposes resolved the question in favor of Scheall, by their answer to Special Verdict 2. Although that verdict dealt with a more general question, the jury could rationally have answered it as it did only by accepting Scheall's version of these matters and rejecting Mooney's. I accept those findings for this purpose.

Sometime prior to his second meeting with Scheall on November 30, 1979, Mooney had contacted The High Country Corporation ("High County") and Sayre and Toso, Inc., both of whom were managing and general agents for various insurance companies, with authority to underwrite or issue insurance policies for those companies. While the evidence does not clearly define the scope or character of these contacts, it is apparent that through High Country Mooney made preliminary arrangements for "primary" liability coverage against bodily injury and property damage in the amount of $300,000, to be written by Guaranty National Insurance Co. ("Guaranty"), as well as "excess" coverage in the amount of $200,000 to be written by Bellefonte Insurance Co. ("Bel-

lefonte"). Likewise, Sayre & Toso had given Mooney an acceptable quotation for a $3,000,000 excess liability policy to be written by the Mission Insurance Co., for whom they were general managing agents.

At High Country, Mooney dealt with one Karl Eggers, that agency's underwriting manager, and at Sayre and Toso with a staff underwriter named Gretchen Simone. It was then the practice both of High Country and Sayre and Toso to verbally "bind" an insurer for whom they were general or managing agents, based upon a broker's informal representations as to the nature and associated risks of the coverage desired by a potential insured, and a concomitant agreement between the broker and the agent concerning the cost of such coverage.

On November 30, 1979, Mooney verbally communicated the contents of the completed Guaranty application to Eggers. From this information Eggers advised Mooney both of the amount of the premium required and that coverage would be bound or in effect as of that date. On December 3, 1979, Eggers wrote to Mooney confirming the specific assumptions under which he had bound Guaranty and Bellefonte to coverage, noting among other things the coverage limits, the cost of both policies in the aggregate and on a per-trip basis of 240 trips per year, and the fact that only the three designated drivers were covered. That same day, Mooney forwarded the completed Guaranty application to High Country, accompanied by his firm check in payment of the premium and a note indicating that, insofar as the insured was concerned, the premiums were to be financed through a credit organization known as Unigard Services. Mooney asked High Country to assign numbers to the Guaranty and Bellefonte policies as soon as possible, in order to permit these financing arrangements to be concluded. On December 6, Eggers responded to this request, advising Mooney in writing of the numbers of the policies then being processed, and asking him to review those policies when received. The record indicates that both

the Guaranty and Bellefonte policies were issued on December 18, 1979, and forwarded directly to Mooney.

The declarations page of the Guaranty policy, as pertinent here, designated the effective terms of the insurance as November 30, 1979–November 30, 1980, named "John Scheall d/b/a Scheall Driveaway" as the insured, and defined "covered autos" as "any non-owned vehicle driven by the Insured in the course of its delivery within a 1500 mile radius of Denver, Colorado." The declarations also contained a list of other "forms and endorsements" incorporated in the policy, of which four are of specific interest in this case.

The first of these endorsements (denominated "A800") notes that it "changes the policy," and further states that Guaranty "WILL NOT BE LIABLE FOR ANY ACCIDENTS OR LOSSES WHILE A COVERED AUTO IS DRIVEN BY" ANY *OTHER DRIVER* THAN

"William Cook DOB–TBA Drivers License # TBA

John F. Scheall DOB 10/19/42 Drivers License U46108–Colorado

Leonard Weaver DOB–TBA; Drivers License # TBA"

The second endorsement of significance (numbered "A798") is entitled "Driveaway Contractors," and in effect defines "covered auto" as any non-owned vehicle bearing transit plates, which is being driven by or for the insured to the vehicle's destination point. That endorsement also sets forth a schedule for assessing the cost of coverage on a per-trip basis, with the stated assumption that a total of 240 trips will be made per year. The third endorsement mentioned ("A970") makes a series of subsidiary changes in the definitions of the word "insured," although leaving intact the definition of particular interest to this case ("You [the named insured] are an insured for any covered auto."). Finally, with respect to automobiles *owned* by the insured, Endorsement A730 limits the insurer's ability to cancel the policy.

The Bellefonte policy states that it will indemnify the insured, named as "John Scheall d/b/a Scheall Driveaway System," for liability in excess of the limits of the underlying insurance, identified in the declaration as Guaranty National Policy # BA705574. The policy incorporates by reference all internally consistent provisions of that Guaranty policy save those concerning the duty to investigate and defend, and places a stated limit upon coverage of $200,000 which, when aggregated with the underlying Guaranty limits, provided for an insuring scheme of $500,000 total liability limits. Aside from a schedule, again similar to the Guaranty policy, by which the costs of this excess coverage are computed on the basis of 240 trips annually, the remaining provisions of the Bellefonte contract, including endorsements, are unremarkable.

## B.

### The Mission Policy

While the Guaranty and Bellefonte policies were being processed, the issuance of the Mission policy was progressing along similar lines. As Karl Eggers had done with respect to Guaranty and Bellefonte, Gretchen Simone gave Mooney a telephone quotation as to the cost of the Mission policy on November 30, 1979, and when Mooney agreed to the amount of the proposed premium for that policy, orally bound the insurer to instantaneous coverage, upon Mooney's assurance that a written application as well as the initial premium payment would be submitted within ten days. Although Ms. Simone's memoranda of her telephone conversation with Mooney lists a variety of factors of apparent interest to her, her chief concern was apparently the identity of the underlying insurers, and the liability limits and premium costs of those policies. The evidence otherwise establishes that Ms. Simone arrived at the Mission premium quotation using a formula based upon the amounts of the underlying premiums.

As Simone requested, Mooney transmitted the premium payment to Sayre & Toso by letter dated December 3, 1979, and by

separate cover mailed a completed application which was received on December 10. This unsigned document—denominated "Questionnaire for Umbrella or Excess Liability Insurance"—was a form regularly provided by Sayre & Toso to independent brokers such as Mooney, and although it is dated November 30, 1979, it was actually completed by Mooney sometime after his conversation with Ms. Simone. In material part it restates much of the information previously given over the telephone, describing Scheall's enterprise as a driveaway service employing three persons and having annual receipts of $150,000, etc. The coverage desired is described as "excess auto liability" of $3,000,000 and the underlying Guaranty and Bellefonte policies are again identified by name, liability limits and premium amounts. The only other item of significance is a box which indicated—as checked by Mooney—that neither of the underlying policies contained less than standard coverage or had any restrictive endorsements.

When the application was received by Simone on December 10, she reviewed its contents, and after determining that the information conformed generally with Mooney's earlier representations, drafted and issued the policy that same day. As previously indicated, the Guaranty and Bellefonte policies were not then in existence, and Ms. Simone thus had no opportunity to review any of their provisions before issuance of the Mission policy.

The declarations page of the Mission policy identifies the insured as "John Scheall d/b/a Scheall Driveaway Service," and states that the coverage therein provided shall be "excess automobile liability" in the amount of "3,000,000 excess of underlying policies." The term of the policy was for one year, commencing 12:01 a.m. November 30, 1979.

The document of primary importance in the Mission policy, for present purposes, is the page labeled "Excess Public Liability And/Or Property Damage (Direct Insurance)," which sets forth the general formula for determining Mission's excess liability in the event of loss, and contains provisions material to the operation of the policy under the headings "Exclusions," "Definitions," and "Conditions." That part of the page which defines Mission's liability consists of two parts, the first a general recitation of those occurrences against which the insured will be indemnified and the second a multi-part proviso consisting of paragraphs labeled (a) through (e). Of these provisions only paragraph (a) (excluding subparagraphs (a)(i) and (a)(ii)) is of material importance to this action. It provides that:

> "(a) Liability attaches to the Underwriters only in respect of such hazards as are set forth in Item 4 of the Schedule and only for such coverages and limits against which an amount is inserted in Item 8(b) or 8(c) of the Schedule and then only after the Primary and Underlying Excess Insurers *have paid or been held liable to pay* the full amount of their respective ultimate net loss liability as set forth in the Schedule in Item 8(a) and designed the 'Primary and Underlying Excess Limit(s)'...."

(emphasis added).

Also appearing on this page is paragraph 4, under the heading "Exclusions," which provides that "This Insurance is also subject to all the exclusions contained in the policy/ies of the Primary Insurers," and certain paragraphs under the heading, "Conditions." Three of these latter paragraphs are of substantial importance here and are set out in their entirety:

> "4. ATTACHMENT OF LIABILITY. Liability to pay under this Insurance shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limit(s) or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limit(s) and then only after the Primary and Underlying Excess Insurers have paid or have been held

liable to pay the full amount of the Primary and Underlying Excess Limit(s).

5. MAINTENANCE OF PRIMARY INSURANCE. It is a condition of this Insurance that the policy/ies of the Primary and Underlying Excess Insurers shall be maintained in full effect during the currency of this Insurance except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of occurrences during the policy year.

In respect of the hazards set forth in Item 4 of the Schedule this Insurance is subject to the same warranties, terms, conditions and exclusions (except as regards the premium, the obligation to investigate and defend, the renewal agreement (if any), the amount and limits of liability other than the deductible or self-insurance provision were applicable, AND EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the policy/ies of the Primary Insurers prior to the happening of an occurrence for which claim is made hereunder and should any alteration be made in the premium for the policy/ies of the Primary Insurers during the currency of this Insurance, then the premium hereon shall be adjusted accordingly.

\* \* \* \* \* \*

7. CANCELLATION. This Insurance may be cancelled at any time at the written request of the Assured or may be cancelled by or on behalf of the Underwriters provided 30 days' notice in writing be given.[5]

If this Insurance shall be cancelled by the Assured, the Underwriters shall retain the earned premium hereon for the period that this Insurance has force or pro-rata of the Minimum Premium, whichever is the greater. Notice of cancellation by the Underwriters shall be effective even though the Underwriters make no payment or tender of return premium.

---

**5.** I note that, in contrast to the quoted provision, Clause 6 of the standard clauses provides for *ten*

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction hereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

The Mission policy also contained a schedule, and three accompanying endorsements, all incorporated into the policy. The obvious purpose of the schedule is to give definition to the excess coverage scheme created elsewhere in the policy. Accordingly, in items 7(a) and 7(b) the schedule again identifies Guaranty and Bellefonte as the primary and underlying excess insurers respectively, setting out the limits of coverage at item 9. Item 8 is perhaps the most significant provision, and if the form had been used as designed, the bodily injury/property damage and combined coverages of each of the three policies would have been set out in detail. Instead Item 8 bears only the notation, "Refer Endorsement No. 1," and otherwise identifies only the limits of the excess Mission policy.

Of the three endorsements which accompany the policy, Endorsement # 1 is for this reason the most important. The document is comparatively brief and in relevant part provides as follows:

"ENDORSEMENT #1 EFFECTIVE: November 30, 1979

SCHEDULE

LIMITS OF LIABILITY:

| | |
|---|---|
| GUARANTY NATIONAL INSURANCE CO. – | BODILY INJURY AND PROPERTY DAMAGE COMBINED $300,000 EACH PERSON INCLUDED EACH OCCURRENCE |
| BELLEFONTE INSURANCE CO. – | BODILY INJURY AND PROPERTY DAMAGE COMBINED $200,000 EXCESS $300,000 |
| MISSION INSURANCE CO. – | $300,000 EXCESS $500,000 BODILY INJURY AND PROPERTY DAMAGE COMBINED" |

It is thus readily apparent both from the tenor of the document and from Gretchen

---

days notice of cancellation.

Simone's own uncontroverted testimony that Endorsement # 1 was to serve in lieu of a completed Item 8 in the schedule, and indeed was attached in an effort to describe the respective liability of the three insurers with more detail than was possible given the perceived space constraints of Item 8.

### C.

### Events Subsequent To Issuance of the Mission Policy

In connection with the Guaranty application, Eggers had asked Mooney to obtain the date of birth and motor vehicle operator's license numbers for the three individuals to be covered as drivers (Scheall, Weaver and Cook), so that he could determine whether Mooney's representations concerning their "clean" driving records was correct. As of November 30, Mooney had been able to obtain that information only with regard to Scheall. Within a week or two thereafter, Mooney telephoned Scheall's office and obtained the necessary information concerning Cook. He continued in his efforts to do the same for Weaver. By January 4, 1980, with the exception of Weaver's date of birth, Mooney had submitted all of the requested information to Eggers.

In the meantime, Eggers used the information originally given him to obtain a motor vehicle report on John Scheall. He was alarmed to discover that Scheall had logged some 15 traffic violations since 1975. On January 10, Eggers sent a letter to Mooney, attaching a copy of Scheall's driving record, and advised him that the premium for the Guaranty and Bellefonte policies would have to be increased by 50% effective 2/1/80 if those insurers were to continue to afford coverage. Although Mooney was confident that he immediately communicated this demand either to Scheall or Cook, Scheall's response is unknown. It is apparent, however, that even had Scheall acquiesced in the proposed increase, subsequent events would have been the same, since Eggers had by now had sufficient time to obtain a driving report on William Cook, which was found to be nearly as poor as Scheall's.

At this point, Eggers telephoned Mooney to inform him that even with an increased premium, neither Guaranty nor Bellefonte would continue to provide coverage. On January 30, Eggers restated this position to Mooney by letter, advising him that notices would be forthcoming, cancelling both the Guaranty and Bellefonte policies, and that Scheall would have only until February 29, 1980, in which to secure other coverage.

Within a few days thereafter, Mooney relayed Eggers' communication to Scheall, who reportedly asked him to seek alternative coverage immediately, although the record fails to indicate what steps, if any, were made in that direction. True to Eggers' prediction, on February 13, 1980, High Country mailed notices of cancellation for both the Guaranty and Bellefonte policies to the offices of Scheall Driveaway Service. Although separate notices were used for each policy, they were sent in the same envelope by certified mail, return receipt requested. The mailing receipt offered into evidence bears the signature of Scheall's part-time employee, Tony Tobias, and indicates that the notices were received at Scheall's office on February 15, 1980. The effective date of the cancellations was February 28, 1980.

In addition, High Country sent identical notices of cancellation to Unigard Services (the financier of Scheall's premiums), to Mooney at Insurance Technology, and to the general offices of both Guaranty and Bellefonte. A noteable omission from the list of addressees for the notices were Mission Insurance Co. and its general managing agent, Sayre & Toso.

Mooney's files indicate that he received his copy of the notices on February 14, 1980. He stated that he would have notified Mission of the cancellation as soon as that fact became known to him. According to Mooney, he never deviated from this practice, and would first have given oral notification, followed by a written confirmation. Although Mooney could not spe-

cifically recall doing any of this, he testified that he would necessarily have done so before March 11, and in all likelihood before February 28, 1980.[6]

As noted, on March 4, 1980, the accident in question took place.

The jury found that Mooney's office (Insurance Technology Corp.) was notified of the accident in question on March 5, and that such notice was reasonably timely (Special Verdicts 7 and 8). In addition, the jury determined both that Mooney had been authorized by Mission to receive oral notice of the loss and that a reasonable man would otherwise have believed that notice to Mooney's office was sufficient (Special Verdicts 5 and 6).

On March 11, 1980, Mission, through Sayre & Toso, transmitted its own notice of cancellation. That notice, as with the earlier Guaranty National and Bellefonte cancellations, simply notified of the fact of cancellation; it did not, of itself, state the reason therefor.

The jury also found that Mooney's office had informed Scheall Driveaway on or before March 14, 1980, that the Mission policy no longer afforded coverage, and that Scheall reasonably believed that this was indeed the case in the period from March 15 through April 28, 1980 (Special Verdict 11). The significance of the April 28 date lies in the fact that it was on that day that Scheall and Mooney executed a "lost policy release form" in connection with the Mission policy. This form, which Mooney prepared and delivered to Scheall for signature, purports to effect a voluntary cancellation of the policy by Scheall as of the policy inception date (known generally as a "flat" cancellation), with an accompanying statement by the insured that the policy is lost or destroyed, that no claims would be made for losses arising after the cancellation (i.e., inception date), and that a premium adjustment was to be made in accordance with the policy terms. The reason for

cancellation, as given in the section of the release marked "For Agency/Company Use," was that "Underlying coverage cancelled." Consistent with the idea of a flat cancellation, however, all of the premium paid on the Missouri policy was ultimately returned to Scheall, through Mooney.

The evidence fails to establish whether the idea of cancelling the policy at its inception originated with Sayre & Toso, Scheall or Mooney, although collaterally, the jury found that it was *not* reasonable for Scheall to assume that the release was intended merely to effect a pro rata refund of the premium (Special Verdict 13). Neither is there sufficient evidence to explain two additional endorsements to the Mission policy (Endorsements 4 and 5) which Sayre & Toso prepared on April 25, some three days *prior* to the ostensible date of execution of the policy release. Endorsement No. 5 states in material part as follows:

"Effective November 30, 1979

In consideration of the return premium shown below it is understood and agreed that this policy is cancelled

Flat

Return Premium: $2,500.00"

Endorsement No. 4, by its terms also effective November 30, 1979, simply deletes Endorsement No. 3 in its entirety and thus eliminates that portion of the policy which had provided that Mission could not cancel *for non-payment of premium* except upon ten (10) days' notice in writing to the insured.

On December 15, 1982, after plaintiffs' original suit had been filed, Scheall addressed a letter to Mission (and to Sayre & Toso), making demand that Mission admit coverage and provide a defense in that action. On January 4, 1983, Mission, through one Robert S. Crossley, responded in writing to Scheall's letter, denying coverage on the basis that the Mission policy had "been cancelled flat, i.e., as at the date of inception, November 30, 1979."

---

**6.** The jury's answer to Special Verdict 4 represents a clear rejection, to some extent, of Mooney's "custom and practice" testimony, since the jury found that Sayre & Toso did not know, before February 28, 1980, that Guaranty and

Bellefonte had mailed notices of cancellation of their policies. I accept that finding, to whatever extent it may impact legal matters presently in dispute.

Neither Guaranty National nor Bellefonte have paid, or been held liable to pay, anything upon plaintiffs' claims. Although a declaratory judgment action to test the question of Guaranty's coverage in connection with the accident now pends in the United States District Court for the Western District of Arkansas, I have been given to understand that the parties and the court there have determined that any resolution of the action should be postponed pending this court's decision in the instant matter.

## III.

## CONCLUSIONS OF LAW

As framed by the parties' pleadings and very thorough briefs, a number of legal issues are presented.[7] I believe those issues may be fairly summarized as follows:

A. With respect to the following questions, does Colorado law control, or instead Missouri law?

B. Were Mission's post-accident cancellations themselves effective to avoid coverage for the accident?

C. Is there an ambiguity in the Mission policy with regard to its status as an excess insurer?

D. Did the pre-accident cancellation of the underlying insurance effect an automatic cancellation or suspension of Mission's coverage?

E. Was the pre-accident cancellation of the underlying insurance valid?

F. As a general matter, can the Mission coverage be reached if Guaranty and Bellefonte have not first paid, admitted liability or been held liable to pay the respective amounts of their underlying coverage?

G. Are the Mission policy conditions relating to maintenance of the underlying insurance, and to the necessity that the underlying carriers have first paid, admitted liability or been held liable to pay the respective amounts of their underlying coverage, subject to the doctrines of waiver or estoppel?

H. Do the facts establish a waiver or estoppel with respect to any of the policy condition defenses mentioned in question G.?

I. May Daniel Paul Newman, despite the Driver Exclusion endorsement, be treated as a "covered driver" under the Guaranty policy, and hence under the Bellefonte and Mission policies, under any of the following theories:

(1) Waiver or estoppel;

(2) Policy ambiguity; or

(3) The doctrine of reasonable expectations.

### A.

### *Choice of Law*

This issue may be resolved with relative ease. As will be seen, however, its resolu-

---

**7.** As will become obvious, a ruling in garnishee's favor on certain of these issues, or alternatively in plaintiffs' favor, would technically render other issues moot. Given the likelihood of an appeal of any ruling the court may make, however, it seems best that I deal with all of the issues listed. As will also become apparent, however, some of those issues can be addressed only tentatively (in my view), given the absence of Guaranty and Bellefonte as parties.

With this multiplicity of issues, I believe it useful to identify one matter that I need not address at length. The jury has put to rest any question concerning the insurer's notice of the accident, having found that the telephone call to Mooney's office on the day following the accident was sufficient for that purpose. Among the evidence which the jury considered on this issue was the fact that the policy jacket itself advised the insured to notify his "Broker" in

case of loss, while at the same time the schedule, which would otherwise identify Sayre & Toso as the recipient for all *written* notices of loss, fails to give any *address* to which such notices must be sent. Even had the jury not made an express finding, I would find Mission estopped from asserting this defense, based upon plaintiffs' implicit designation of Mooney as a proper recipient of notice. See, e.g. *General Acc. Fire & Life Assur. Corp., Ltd. of Perth, Scotland v. Morgan,* 33 F.Supp. 190 (W.D.N.Y. 1940). By the same token, I could scarcely hold Scheall to strict compliance with the written notice provisions of the policy where the insurer has wholly failed to give him the information necessary to fulfil those requirements.

Beyond this, an additional issue raised by Mission—relatively minor, in my view—is addressed in footnote 12., *infra.*

tion is of vital importance to several other issues posed.

■ Whether the choice of law rules followed by the Missouri courts with respect to the other issues mentioned above would involve a use of the "most significant relationship" test, *see Restatement (Second) of Conflicts*, § 188, as the Eighth Circuit suggested in *Havenfield Corp. v. H. & R. Block, Inc.*, 509 F.2d 1263, 1267 (8th Cir. 1975), or instead would require a use of the older *lex locus contractus* rule, *see Miller v. Home Ins. Co.*, 605 S.W.2d 778, 779–80 (Mo. banc 1980), the result here will be the same. As the place where the insurance contracts in question were negotiated, underwritten and delivered, Colorado was clearly the place of contracting for purposes of the *lex locus contracus* rule, *Miller v. Home Ins. Co., supra;* and as the domicile and principal place of business of the insured, the place of business of the policy underwriters, and the place where all the policies, including the Mission policy, were negotiated, underwritten and delivered, it was likewise clearly the state with the "most significant relationship" to the insurance transactions in question. I hold, accordingly, that Colorado internal law must govern with respect to all matters concerning construction and validity of those insurance contracts, including all questions related to cancellation thereof as well as to issues of waiver and estoppel.

### B.

#### *Effect of Mission's Post-Accident Cancellations*

Although Mission has not reargued the position in either its pre-trial or post-trial briefs, it has asserted in its responsive pleadings that Mission's "flat" cancellation was itself a ground for denying coverage in this case.

■ I do not believe that sort of cancellation can provide any defense to coverage under the facts of this case. While I can discover no Colorado authority in point, it would appear almost universally accepted that the rights of an injured third party

in respect of a policy of liability insurance irrevocably attach at the time of the accident, and that those rights may not be destroyed either by a subsequent cancellation of the policy or by mutual recission thereof by the insurer and the insured. *See Spann v. Com'l. Std. Ins. Co. of Dallas, Texas*, 82 F.2d 593, 599 (8th Cir.1936); *Indemnity Ins. of America v. Pitts*, 58 S.W.2d 53, 54 (Tex.Com.App.1933); *State Farm Mutual Auto Ins. Co. v. Kendall*, 104 Ga.App. 481, 122 S.E.2d 139, 142 (1961); *Allstate Ins. Co. v. Matthews*, 40 Misc.2d 409, 243 N.Y.S.2d 114 (1963); *Bachman v. Independence Indem. Co.*, 112 Cal.App. 465, 297 P. 110, 117, 118 (1931); and *see also* 8B *Appleman, Insurance Law And Practice*, § 5020 (1981) and remaining cases collected therein.

I acknowledge those cases which hold that a policy may be cancelled by an insurer, even after the loss has occurred, where issuance of the policy was procured by some fraud of the insured. There, the policy is said to be void *ab initio. See*, e.g., *Taylor v. Black*, 258 F.Supp. 82; *Civil Serv. Employees Ins. Co. v. Blake*, 245 Cal.App. 196, 53 Cal.Rptr. 701 (1966); 8B *Appleman, supra* at pp. 519–21. In the present case, however, Mission neither alleges nor suggests any fraud by Scheall in the original procurement of its policy.

I conclude, in the circumstances, that neither Mission's March 11 or April 25 cancellation, nor the April 28 "policy release," was effective, in and of itself, to divest plaintiffs of any rights they might otherwise have against Mission.

### C.

#### *Is There An Ambiguity In The Mission Policy With Regard To Its Status As An Excess Insurer?*

As noted previously, that portion of the Mission policy denominated "Attachment of Liability" provides that liability shall attach only to the extent of the coverage and limits set forth in items 8(b) or 8(c) of the Schedule accompanying the policy, *and* only after the primary and underlying ex-

cess carriers have paid or have been declared liable for the full amount of the "ultimate net loss liability" stated in item 8(a). The policy then states that the total limits of the primary and underlying excess policies shall be inserted in item 8(b) if practicable, or if not, that the limits of the Mission policy alone shall be set forth in item 8(c) under the heading "Excess Limits," and that Mission "shall be liable to pay the ultimate net loss the Excess of the Limit(s) under the policy/ies of the Primary and Underlying Excess Insurers as set forth in Item 8(a) of the Schedule up to the full amount of the excess limit(s)."

Plaintiffs point out that Mission/Sayre & Toso failed to fill in item 8(a) of the Schedule or to strike out the printed words "not applicable," and that in effect the only information contained in item 8 of the Schedule is the notation under 8(c), "$3,000,000 THREE MILLION DOLLARS," which appears both under the headings "Each Occurrence" and "Aggregate." Plaintiffs argue that by failing to identify the primary and underlying insurers and the applicable limits of their policies, Mission has failed to implement the claimed excess feature of its liability calculus, and that its asserted status as an excess insurer is thus ambiguous.

■ I pause briefly to examine the Colorado rules for insurance policy construction. Under Colorado law, insurance contracts "are to be construed according to the general rules for construction of contracts." *Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 289 (Colo. banc 1982), since a policy of insurance "is not *sui generis* but is treated in the law in the same way as contracts are treated generally and is to be interpreted according to the intent of the parties," *id.* at 289. Moreover, "where the terms of an insurance contract are plain and unambiguous, the court may not rewrite the contract between the parties, nor limit the effect of the contract as written," *Gulf Ins. v. State*, 43 Colo.App. 360, 607 P.2d 1016, 1018 (1979), nor may the court "force an ambiguity in order to resolve it against an insurer," *Martinez v. Hawkeye-Security Ins. Co.*, 195 Colo. 184, 576 P.2d

1017, 1019 (1978), or hold the insurer "liable beyond the scope of risks which have been clearly covered in the insurance policy," *id.* 576 P.2d at 1019. "All of the provisions must be read as a whole," *Mid-Century Ins. Co. v. Liljestrand*, 620 P.2d 1064, 1067 (Colo. banc 1980), and where, as in the case at bar, the policy bears annexed endorsements, "they must be considered as a single instrument and they should be construed together in the absence of an internal conflict which cannot be reconciled." *Martinez v. Hawkeye-Security Ins. Co., supra.* Further, "[t]he endorsement[,] being the last expression of intent[,] prevails if the language of [it and the policy] conflicts." *Id.* 576 P.2d at 1019. Finally, the interpretation of an insurance policy, as with any other written contract, is a matter of law to be determined exclusively by the court. *Ohio Casualty Ins. Co. v. Guaranty Nat'l. Ins. Co.*, 197 Colo. 264, 592 P.2d 397, 398 (1979).

■ As mentioned in the recitation of facts in Section II of this opinion, by use of the note, "Refer Endorsement No. 1," Mission undertook to substitute that document in lieu of completing Item 8. It is readily apparent that Endorsement 1 is intended to define the limits of liability or ultimate net loss to which Mission would be exposed, with the same detail and effect as a completed Item 8, and I find that it has in fact fully achieved that result. Given this, and construing the policy as a whole, I can find no ambiguity at all with regard to Mission's status as an excess insurer as a result of its failure to complete Item 8 within the strict spatial limitations of the printed policy form.

### D.

*Did Mission's Coverage Automatically Terminate or Suspend Upon Cancellation of The Underlying Policies?*

■ As noted, paragraph 5. of the "Conditions" of the policy states, in material part, that Mission's coverage is conditioned upon the maintenance of the primary and underlying excess policies in full force and

effect "during the currency of this insurance." Mission argues that the cancellation of the primary and underlying excess policies on February 28 had the effect of automatically terminating its policy as of that day. Plaintiffs urge that the breach of the condition did not *automatically* accomplish anything, since there is no policy provision specifying that result, citing *International Salt Co. v. Tennant*, 144 Ill. App. 30 (1908), and argue alternatively that there is in this respect at least an ambiguity, given the presence of the general policy cancellation provisions, the ultimate effect of which would be that Mission's coverage continued in effect until the policy was cancelled per those provisions.

Condition 5. is clearly just that—a condition (presumably a condition subsequent)—and if it be given its ordinary meaning, particularly with respect to the general insuring scheme involved here, I believe its breach would in fact automatically result in a *suspension* (not termination) of Mission's coverage during the period of the breach. That is the result which is generally said to attend the breach of a promissory warranty or condition subsequent of the nature involved here, even absent a policy provision so stating. *See generally Ranger Ins. Co. v. Culberson*, 454 F.2d 857, 861 (5th Cir.1971), *cert. den.* 407 U.S. 916, 92 S.Ct. 2440, 32 L.Ed.2d 691 (1972); *Schaefer v. Home Ins. Co.*, 239 Mo.App. 586, 194 S.W.2d 718, 722 (1946), and cases cited therein; *Whitehead v. Fleet Towing Co.*, 110 Ill.App.3d 759, 66 Ill.Dec. 449, 442 N.E.2d 1362, 1366 (1982).[8] In fact, such a rule would seem to be particularly appropriate in the present sort of case, since an insurer such as Mission would seldom if ever know, ahead of time, of the impending cancellation or termination of the underlying policies, and since there would be little gained, in the face of the attachment of liability provisions of its policy, in continuing coverage when it would ordinarily be impossible to satisfy those latter provisions. To hold otherwise—and in the process, presumably, somehow ignore the attachment of liability provisions of the policy—would be to create an insuring scheme whereby Mission would become, during any period of time after cancellation of the underlying policies and before its own cancellation, a primary insurer—something totally foreign to the entire tenor of its policy, and something which would, indeed, amount to the "forcing" of an ambiguity.

There is in fact nothing inconsistent, or ambiguous, as between an automatic suspension of policy coverage during the period of breach of a condition subsequent, and the general cancellation provisions of the policy. As commonly understood, when such a suspension occurs, coverage automatically resumes when the breach of the condition ceases. *Lineas Aereas Colombianas Expresas v. Travelers Fire Ins. Co.*, 257 F.2d 150, 155 (5th Cir.1958); *Fidelity Phenix Fire Ins. Co. of N.Y. v. Pilot Freight Carriers*, 193 F.2d 812, 816 (4th Cir.1952); *Ciaramitaro v. Saskatchewan Government Ins. Office*, 144 F.Supp. 237, 238 (D.Mass.1956). If the insurer becomes knowledgeable of the breach and chooses to cancel entirely because of it, it may do so, presumably by following the cancellation provisions of the policy. This would, in fact, have the effect of allowing the insured to obtain other underlying insurance during the cancellation notice period, thus curing the breach of condition and reinstating coverage during whatever remained of that cancellation notice period. That would not, however, create or rein-

---

**8.** I do not consider *International Salt Co. v. Tennant, supra*, as necessarily in conflict with this general rule. In the first place, the court there considered only whether cancellation of the underlying coverage would automatically *terminate* the policy, and did not consider whether a *suspension* of coverage might be the result. Second, the parties' arguments were actually directed (at least in part) to the appropriate interpretation of the word "during" ("during the existence of this policy") in a factual situation where, at the time the excess policy was issued, the underlying insurance was already in existence and was scheduled to terminate, by its terms, some five months before the excess policy was to terminate. This latter factor clearly influenced the result reached by the court, which was actually a decision of the point on an interpretation/ambiguity basis. *Id.* at 36–7.

state coverage during the period of suspension, before the breach was cured.

I conclude, for the foregoing reasons, that if there was a valid cancellation of the underlying policies, Mission's coverage was suspended during the relevant period subsequent to February 28, 1980 and prior to its own cancellation (either March 21 or April 10, depending upon whether the 10 or 30 day notice provision controls), and, unless that defense has been waived or is the subject of an estoppel, affords no coverage for the accident in question.

### E.

*Was the Pre-Accident Cancellation Of the Underlying Insurance Valid?*

The terms of both the Guaranty policy (Part VI D.2.) and the Bellefonte policy (Part V 6.) provide for cancellation by the insurer upon ten days' notice. The pre-accident cancellations sent by both Guaranty and Bellefonte clearly met that requirement. Plaintiffs, however, suggest that Colo.Rev.Stat. § 10–4–602, or alternatively Endorsement A730 to the Guaranty policy (also incorporated into the Bellefonte policy), prohibited Scheall's policies from being cancelled at all, except for reasons not present here.

■ The short and probably technically correct answer would appear to be that the validity of the Guaranty and Bellefonte cancellations cannot really be adjudicated in this proceeding in any binding fashion— that is, without running the obvious risk of inconsistent adjudications—given the absence of Guaranty and Bellefonte as parties. Since there might conceivably be a basis for disagreement on that subject, however, *see Home Indemnity Co. v. Mission Ins. Co.,* 60 Cal.Rptr. 544 (Cal.App. 1967), I will address plaintiffs' points, recognizing at the same time that my views cannot bind Guaranty and Bellefonte, and that a contrary ruling in the declaratory judgment action in the Western District of Arkansas (to which Guaranty is a party) will obviously control as to those points with respect to Guaranty.

■ The difficulty with plaintiffs' first argument is that § 10–4–602 is rather clearly inapplicable to policies such as those presently at issue. It is, in fact, limited to automobile insurance policies "insuring a single individual, or husband and wife, or family members residing in the same household, as named insured ...." *Colo. Rev.Stat.* § 10–4–601. The statute is thus designed to control ordinary owner or family automobile insurance policies, rather than a business policy such as Scheall's; a point made doubly clear by the provisions of § 10–4–608, which exempt from the coverage of § 10–4–602 "any policy insuring more than four automobiles." Scheall's policies, of course, were intended to cover considerably more than four automobiles.

■ Endorsement A730, by its express terms, imposes cancellation limitations only with respect to automobiles *owned* by the insured (and if the insured is an individual). It would indeed invalidate the Guaranty and Bellefonte cancellations here, to the extent those policies covered automobiles *owned* by Scheall. Rather clearly, however, the endorsement is not operative beyond its own terms, and displaces the other policy cancellation provisions only to the extent of those terms. Insofar as non-owned automobiles (such as those involved here) are concerned, the other, general cancellation provisions would continue to be operative.

I conclude that the pre-accident cancellation of the Guaranty and Bellefonte policies was not in violation of § 10–4–602; was not—as far as the automobiles here concerned—controlled by Endorsement A730; and was otherwise valid in all respects.

### F.

*As A General Matter, Can the Coverage Afforded by Mission be Reached If the Underlying Insurers Have Not Paid Or Been Held Liable To Pay?*

■ As previously indicated, the Mission contract defines Mission's role in the overall insuring scheme at issue in this case as an excess insurer, to whom liability

may attach "only after a predetermined amount of primary coverage has been exhausted." *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal.App.3d 593, 598, 178 Cal.Rptr. 908, 910 (1982).[9] When, as in the case at bar, such coverage is written to be in excess of certain identified policies, it is said to be "specific excess insurance," *id.* 178 Cal.Rptr. at 911, with the implication that the conditions to attachment of liability may be satisfied only by reference to those specific underlying policies and no others.[10]

Based upon these theories, together with the fact that Condition 4. of the policy specifically provides that "[l]iability ... shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for ... [their] Limit(s) or unless and until ... and only after the Primary and Underlying Excess Insurers have paid or been held liable to pay the full amount of ... [their] Limits," Mission suggests that, since Guaranty National and Bellefonte have not paid, admitted liability, or been held liable to pay anything upon plaintiff's claims, there can be no present liability on its part. Plaintiffs counter with a citation to *Home Indemnity Co. v. Mission Ins. Co., supra,* and argue that even though Guaranty and Bellefonte are not parties to this action, the court can and should undertake to make at least a theoretical determination as to their liability, and in turn treat the quoted policy provisions as satisfied.

I must respectfully decline plaintiffs' invitation. The language of Condition 4., as pertinent to this argument, requires that the underlying insurers first have "been held liable." To me that clearly demands a final judicial determination, binding upon those underlying insurers, which establishes their liability, rather than some *ex parte*

theoretical determination thereof. I can of course indulge in the latter exercise, and because of the peculiar posture of the case have in fact done so to some extent; but given the fact that Guaranty and Bellefonte are not and never have been parties to this action, there is simply no way I can enter any judgment here which will be binding on them. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110, 89 S.Ct. 1562, 1569, 23 L.Ed.2d 129 (1969).

*Home Indemnity Co. v. Mission Ins. Co., supra,* reaches a contrary result. That case involved a declaratory judgment proceeding which had been instituted while the separately filed underlying personal injury action was still pending. The underlying insurer (Tower), with policy limits of $10,000, was an original party to that declaratory judgment proceeding. During the course of the proceedings the personal injury action was settled, with Tower and others (not including Mission) paying a total of $40,000, of which $9,000 was contributed by Tower. Tower was then dismissed from the declaratory judgment action. With respect to Mission's subsequent claim that Tower's coverage had not been exhausted, and thus that its own liability had not been triggered, the court held that Tower's election to compromise, and its subsequent dismissal from the suit, did not preclude the court from determining whether Tower "should be 'held liable' to pay the full amount of its liability." 60 Cal.Rptr. at 670.

As may be seen, the rather peculiar facts of *Home Indemnity* are distinguishable from those here, although I do not seek to deal with the case on that basis. Rather, and with all respect, I simply do not consider it persuasive precedent, either gener-

---

9. As the court in *Olympia* noted, such a scheme greatly reduces the excess insurer's risk of loss, "a fact reflected in the cost of the policy." *Id.* 126 Cal.App.3d at 598, 178 Cal.Rptr. at 910.

10. Therefore, the fact that plaintiffs have heretofore received $300,000 in proceeds from Commercial Union Insurance, the insurer for American Auto Shippers, is of no assistance to them in

fulfilling this condition, since it is not one of the policies to which the Mission insurance was specifically intended to be excess. In fact, the policy recognizes the potential for other, underlying but unscheduled policies of this type in a provision denominated "ultimate net loss," without in any way altering the attachment of liability provision.

ally or with regard to the result I believe the Colorado courts would reach. The decision advances no actual reasoning for its conclusion; and clearly overlooks the fact that the excess carrier has a legitimate motivation for insisting upon a determination which is *binding* upon the underlying carriers, in order to avoid the very real possibility of inconsistent adjudications on the subject. In the circumstances, I believe anything other than a literal interpretation of the language in question would be inappropriate.

Beyond all of this there is, as plaintiffs pointed out in their pre-trial brief, an argument that policy provisions such as those involved here may, in effect, be ignored, upon the theory that an excess insurer "has no rational interest in whether the insured *collected* the full amount of the primary policies, so long as it [the excess insurer] was only called upon to pay such portion of the loss as was in excess of those policies." *Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665, 666 (2d Cir.1928). However, I could not very well apply *Zeig's* reasoning here, even if I personally accepted that reasoning, since to do so would appear to run headlong into the clear Colorado rule that an insurance policy must generally be enforced as written. *See Gulf Ins. v. State, supra.* Like the District Court in *Johnson v. Milgo Industrial, Inc.*, 458 F.Supp. 297, 301 (D.Minn. 1978), I do not believe *Zeig* can be applied in a situation where—as in this case—the policy contains an express provision requiring resort to underlying insurance. Furthermore, in the present case it would seem that Mission *does* in fact have a "rational interest" in having its policy read literally in this respect. Plaintiffs here seek to garnish not simply the Mission policy limits themselves ($2,500,000), but an amount equal to the entire unpaid portion of their judgment ($5,475,000).[11] Thus, as in *Johnson v. Milgo Industrial, Inc., supra,* Mission has, in these circumstances, a "compelling interest" in enforcing the policy provi-

sions in question. In addition, since the underlying insurers have a duty "to defend in good faith ... [and] to represent the interests of the excess carrier," *United States Fire Ins. Co. v. Lay*, 577 F.2d 421, 423 (7th Cir.1978); *and see also Est. of Penn. v. Amalgamated General Agencies,* 148 N.J.Super. 419, 372 A.2d 1124, 1127 (1977), to ignore the policy provisions in question would effectively deprive Mission of a material benefit for which it implicitly bargained when it undertook the risk of excess coverage. *United States Fire Ins. Co. v. Lay, supra.*

I believe the preferable rule, and the one Colorado courts would follow, may be found in *Johnson v. Milgo Industrial, Inc.,* as well as in those cases which have addressed the same basic question in connection with the typical excess policy requirement that the limits of the underlying insurance be "exceeded," or that the proceeds thereof be "exhausted," before the excess coverage may be reached. Those latter cases generally hold that "insurance which is subject to an 'excess' provision does not qualify as valid and collectible insurance ... until the limits of the primary policies have been exhausted." *Eisenhower Osteopathic Hospital v. Taylor,* 609 P.2d 1114, 1115 (Colo.App.1980); *and see also Molina v. United States Fire Ins. Co.,* 574 F.2d 1176, 1178 (4th Cir.1978); *Geerdes v. St. Paul Fire & Marine Ins. Co.,* 128 Mich.App. 730, 341 N.W.2d 195, 197 (1983); *Thomson National Press Co. v. National Union Fire Ins. Co.,* 16 Mass. App. 242, 451 N.E.2d 432, 436 (1983); *Whitehead v. Fleet Towing Co.,* 110 Ill. App.3d 759, 66 Ill.Dec. 449, 453, 442 N.E.2d 1362, 1366 (1982); *Liberty Mutual Ins. Co. v. Truck Ins. Exchange,* 245 Or. 30, 420 P.2d 66, 69, 70 (1966); *Safeco Ins. Co. v. Insurance Company of North America,* 522 S.W.2d 867, 868, 869 (Tenn.1975). While the policy language here concerns the underlying insurer's admission or adjudication of liability for the underlying limits, as well as its payment of those limits, I

---

**11.** Plaintiffs attempt to reach the amounts above Mission's stated 2,500,000 limits under a theory

of Mission's alleged "bad faith" in refusing to settle within its policy limits.

can find no meaningful distinction in that fact. The essential principle is simply that an unambiguous excess policy provision is entitled to be enforced as written.

■ In reliance both upon the Colorado rules for interpreting the Mission policy and the general legal principles attending the concept of excess insurance, I conclude that the Mission policy conditions relating to attachment of liability must be enforced as written, and that I have no ability to avoid their effect by attempting to adjudicate the liability of non-party underlying carriers.[12]

### G.

*Are The Mission Policy Conditions Relating To Maintenance Of the Underlying Insurance, And To The Attachment of Mission's Liability, Subject To the Doctrine of Waiver or Estoppel?*

Plaintiffs' other ably-asserted contentions aside, their chief argument in these proceedings is that Mission has waived, or is estopped from asserting, defenses based upon those policy provisions which make the maintenance of the underlying policies, and prior resort to the underlying insurers, conditions to continuation of Mission's coverage or to reaching that coverage.

■ When an insurer's assertion of policy defenses is met with the argument that those defenses have been lost through waiver or estoppel, the general procedure is to determine first whether the provisions upon which the insurer relies are conditions of *forfeiture*—which are traditionally subject to waiver or estoppel—or instead are matters relating to the scope of *coverage*, which (as many courts view it) cannot be avoided under either the doctrine of waiver or any theory of estoppel of the nature asserted here. *See, e.g., Baton v. Transamerica Ins. Co.,* 584 F.2d 907, 911 (9th Cir.1978) (applying Oregon law); *Kaminer v. Franklin Life Ins. Co.,* 472 F.2d 1073, 1077 (5th Cir.1973) (applying Florida law); *Brown v. First Ins. Co.,* 424 F.2d 680, 681 (9th Cir.1970) (applying Hawaiian law); *Albert J. Schiff Associates, Inc. v. Flack,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84 (Ct.App.1980); *Sellers v. Allstate Ins. Co.,* 113 Ariz. 419, 555 P.2d 1113, 1116 (1976); *Allstate Ins. Co. v. Walker,* 114 Ga.App. 732, 152 S.E.2d 895, (1966).[13]

These principles were expressly recognized by the Colorado Supreme Court in *Hartford Livestock Ins. Co. v. Phillips,* 150 Colo. 349, 372 P.2d 740 (1962). Adopt-

---

**12.** I note, in passing, Mission's additional argument that no indemnifying event has even occurred in this case, since under his settlement with the plaintiffs Scheall's personal assets are exempt from execution, and thus as a practical matter he is not "legally obligated to pay" any portion of the plaintiffs' judgment. Although Mission cites *United States Fire Ins. Co. v. Lay* in support of this contention, I find the argument without merit. In contrast to *United States Fire Ins. Co. v. Lay,* the policy language in this case provides that Mission shall "pay on behalf of the assured all sums which the assured shall become legally obligated to pay *or by final judgment be adjudged to pay*" (emphasis added). It is clear, his contract under Mo.Rev.Stat. 537.065 notwithstanding, that Scheall has been finally adjudged to pay the sum of $5,775,000 to the plaintiffs, albeit through the liquidation of a specified asset, in this case insurance proceeds. I would in addition observe that the garnishee's interpretation of the effect of a § 537.065 contract would render that statute meaningless insofar as *indemnity* policies are concerned, since plaintiffs who entered into such agreements

with a tort feasor insured in that fashion would without exception find themselves unable to reach the very insurance proceeds for which they had bargained. Therefore, all other coverage questions aside, I find that the final judgments against Scheall do in fact constitute a "loss" within the meaning of the Mission policy.

**13.** There are some jurisdictions which permit the use of an *estoppel* theory, based upon the insurer's post-loss actions (a situation to be distinguished from an insurer's estoppel based upon it or its agent's misrepresentations or mistakes in the original issuance of the policy, as discussed in the text, *infra* at 1206). For a sample of those cases which have departed from the general rule, *see* Note, *Insurance Extension of Coverage by Waiver or Estoppel,* 25 North Carolina L.Rev. 209 (1947); Note, *Waiver and Estoppel Used to Extend Insurance Coverage,* 25 Maryland L.Rev. 337 (1965); and *see also Taylor v. Commercial Union Ins. Co.,* 614 F.2d 160, 163, 164 n. 5 (8th Cir.1980) (applying Missouri law) (*but see Macalco Ins. v. Gulf Ins. Co.,* 550 S.W.2d 883, 891 (Mo.App.1977).

ing the language of 29A Am.Jur. § 1135 as its own, the court stated that:

"[w]hile an insurer may be estopped by its knowledge from insisting upon a forfeiture of a policy, the coverage, or restrictions on the coverage, cannot be extended by the doctrine of waiver or estoppel. While it is true that if the insurer with knowledge of facts which would bar an existing primary liability, recognizes such primary liability by treating the policy as in force, he will not thereafter be allowed to plead such facts to avoid his primary liability, the doctrine of waiver cannot be invoked to create a primary liability and bring within the coverage of the policy risks not included as contemplated by its terms."

*Id.* 372 P.2d at 742; and *see also Mid-Century Ins. Co. v. Liljestrand, supra.*[14] Accordingly, the first question to be addressed is whether the maintenance of primary insurance and attachment of liability provisions of the Mission policy are conditions of forfeiture and thus subject to waiver or estoppel, or instead are matters of coverage.

■ While, again, there is no Colorado authority which articulates a basis for making a distinction between matters of coverage and other conditions, I have no reason to believe Colorado courts would depart from the basic principles under which this question has been addressed in a number of other jurisdictions. At least as a very general matter, those principles suggest that where the provision relates to the scope of the risks to be covered (either by inclusion or exclusion) or to the dollar amount of coverage, it is to be dealt with

as a "coverage" matter; otherwise, and particularly if it operates to furnish a ground for the forfeiture of coverage or for the defeasence of liability, or otherwise operates in the nature of what might be termed an "affirmative defense," it will be treated as a "forfeiture" clause. *See Ahnapee & W. Rwy. Co. v. Challoner,* 34 Wis.2d 134, 148 N.W.2d 646, 650 (1967); and *see also Annot., Insurance Coverage—Estoppel—Waiver,* 1 ALR 3d 1139 (1965).

■ Applying these principles to the instant provision for maintenance of underlying insurance, I note that the provision does not, as such, address the subject of the risks insured against (which autos are covered or excluded, what usages thereof are covered or excluded, which "insured" persons are covered or excluded, etc.) or the dollar amount of coverage. Instead, it actually functions only as a *condition* (as, indeed, it is labeled) subsequent, the breach of which would operate to defeat, or "defease" the coverage defined elsewhere in the policy. While I recognize that, like any condition worthy of the name, it is indeed concerned with "liability," it is in fact only a mechanism for the avoidance thereof. I hold, accordingly, that the requirement for continuing maintenance of the underlying coverage is a condition of forfeiture, and thus generally subject to the doctrines of waiver and estoppel.

The policy provisions relating to the attachment of liability present a rather more complex problem. There are in fact two separate provisions which address this point, the first being section (a) of the

---

14. *Gulf Ins. Co. v. State, supra,* appears, at least in its result, to represent a departure from this rule. There, the trial court held that an insurer had a duty to defend the state of Colorado against a prisoner claim for injuries received during a prison riot and for negligent treatment of those injuries following that disturbance, despite the fact that the policy contained a provision expressly excluding riots, civil commotion and mob action from the scope of coverage. After reversing the trial court's finding that this exclusion was somehow ambiguous, the court of appeals remanded the case for trial on the separate question of whether the insurer's "conduct

in assuming defense of [the] action for two and one half years constituted a waiver" of that exclusion, and whether the insurer had therefore waived and was estopped "as a matter of law from asserting non coverage." *Id.* 607 P.2d at 1019. The Court of Appeals did not specifically address the rule in question, however, or mention *Hartford Livestock;* and given the fact that the latter case was a clear statement on the point by Colorado's highest court, which seems implicitly to have reaffirmed the rule in *Mid-Century, supra,* it appears to me that the governing Colorado law is represented by those Colorado Supreme Court cases.

general proviso, and the second being paragraph (4) of the conditions section.

 In considering the effect of these provisions, I conclude—although the point is not entirely free from doubt—that while each plays a part in the general scheme by which Mission's liability will be determined, they operate in that connection merely as *conditions* (perhaps, for that purpose, as conditions *precedent*) in respect of such liability and do not define or effect *coverage*, as such. As proviso (a) itself recognizes, both the hazards insured against, and the amount in dollars and cents by which Mission has placed itself at risk (in short, the *coverage* created under the policy), are delineated elsewhere in the policy and operate independently of the provisions in question. It is likewise clear that nothing relating to the liability of the underlying insurers can operate to increase or decrease the dollar amount of Mission's coverage, or add to or detract from the schedule of risks assumed. The provisions in question simply take that coverage, as created elsewhere in the policy, and establish conditions which must be satisfied before liability thereunder will attach.

 Conditions—even conditions precedent—to a policy's operation, or to liability under it, are generally thought to be subject to waiver or estoppel, as those doctrines are applied by the courts of a particular jurisdiction. *See generally* 16B *Appleman, supra* § 9083, at pp. 513–14 and cases cited therein. They are, for present purposes, thus conditions of forfeiture in the sense that a failure to satisfy them operates to prevent or defeat liability for coverage which would otherwise exist. In fact, I consider these provisions to have an effect identical to the "co-insurance" clauses commonly found in commercial policies of this type.[15] Since the latter have been characterized as conditions of "penalty or partial forfeiture," subject to the doc-

trines of waiver or estoppel, *English & American Ins. Co. v. Swain Groves, Inc.,* 218 So.2d 453 (Fla.App.1969); *and see also, Industro-Motive Corp. v. Morris Agency, Inc.,* 76 Mich.App. 390, 256 N.W.2d 607 (1977); *Hanover Fire Ins. Co. of N.Y. v. Salter,* 254 Ala. 500, 49 So.2d 193 (1950), the same result should obtain here. Accordingly, I hold that the attachment of liability provisions of the Mission policy are also subject to the doctrine of waiver or estoppel.

### H.

#### *Existence Of Waiver Or Estoppel*

Plaintiffs assert, as against Mission directly, two separate theories of waiver or estoppel. First, plaintiffs argue that Mission has waived or is estopped from asserting any defense based upon cancellation of the underlying policies, or lack of prior resort to them, noting that on March 11, 1980, with knowledge (as the jury found) that the underlying carriers had cancelled effective February 28, Mission sent its own notice of cancellation, advising that its excess coverage would terminate on March 21, 1980. Second, and in a more general sense, plaintiffs argue that Mission has waived, or is estopped from asserting, any defense which was not asserted in its original declination letter to the insured (Crossley's letter of January 4, 1983), citing among other authorities *Delmar Bank of University City v. Fidelity & Deposit Co. of Maryland,* 428 F.2d 32 (8th Cir.1970) (Missouri law); *Nelson v. Aetna Life Ins. Co.,* 359 F.Supp. 271 (W.D.Mo.1973) (Missouri law); and *Aetna Casualty & Surety Co. v. Haas,* 422 S.W.2d 316 (Mo.1968). The only defense asserted in that letter is of course a "flat" cancellation of the policy (presumably referring to the April 25 cancellation or the April 28 voluntary policy release executed by Scheall), which I have in fact found to be no defense at all.

---

**15.** "Co-Insurance" signifies a relative division of the risk between the insurer and the insured, dependant upon the relative amount of the policy limits and the actual value of the property insured. Such clauses are designed to compel

the insured either as a self insurer or otherwise to carry insurance on the risk in an amount equal to the percentage of its value fixed by the particular clause. *See Home Ins. Co. v. Eisenson,* 181 F.2d 416, 418 (5th Cir.1950).

The difficulty with plaintiffs' first point, as the discussion under Point D. may suggest, is that there would seem to be nothing inconsistent between an automatic suspension of coverage for breach of a policy condition, and a later cancellation of the policy when the insurer learns of that breach. In other words, there is nothing in the latter action by the insurer which would suggest any intent on its part to waive the suspension of coverage which earlier occurred. In fact, just the opposite would seem to be the case. Nor is it possible to find any estoppel in these circumstances, since there is no indication of any prejudice to the insured in connection with that chain of events. See discussion and cases *infra*.

Plaintiff's second point requires a more detailed discussion of the law of waiver and estoppel as applied in insurance situations.

I doing so, I turn first—for purposes of general analytical guidance since there are no Colorado cases directly in point—to the Missouri cases cited by plaintiffs. In general, each of those cases stands for the proposition that an insurer who first denies coverage on one basis may not later assert new and different grounds for denial. While the theoretical basis for these holdings is not entirely clear, at least one Missouri court has spoken of the matter in terms of "waiver," with the implication that no actual prejudice to the insured need be shown. *Gabriel v. Farmers Mutual Fire Ins. Co.*, 108 S.W.2d 628, 631 (Mo.App. 1937). Other Missouri cases, however, have invoked the rule only where there was a discernable element of prejudice to the insured, *see Mitchell v. American Mutual Assn.*, 226 Mo.App. 696, 46 S.W.2d 231, 236 (1932); and others have specifically declared the principle to be one of estoppel, *see Stone v. Waters*, 483 S.W.2d 639, 645–46 (Mo.App.1972); *Grafe v. Fidelity Mut. Life Ins. Co.*, 84 S.W.2d 400, 404 (Mo.App. 1935).

The Missouri Court of Appeals, Kansas City district, had occasion to consider this apparent conflict in Missouri law, which upon analysis it declared to be "more apparent than real," since "no Missouri case has required any more than a very slight degree of prejudice to the claimant." *Morris v. Reed*, 510 S.W.2d 234, 240 (Mo.App. 1974). This implicit recognition of the thread of estoppel running through the Missouri cases was expressly confirmed in *Macalco Ins. v. Gulf Ins. Co.*, 550 S.W.2d 883 (Mo.App.1977), when the Missouri Court of Appeals, Springfield District, declared that an "examination of cases shows estoppel, with some element of unfairness, lack of notice, or other detriment to the insured, rather than voluntary waiver without such element, is the preferred theory when the insurer elects a policy defense," *id.* at 891–92, *citing Aetna Casualty v. Haas, supra* and *Morris v. Reed, supra.*

In light of these well reasoned and comparatively recent decisions of the Missouri Courts of Appeal, I believe it proper to conclude that under Missouri law the loss of an insurer's defense is a matter governed by the principles of estoppel, with an attendant requirement of *some* showing of prejudice to the insured, and that this position indeed reflects the mainstream of thinking in American law. *See Markoff v. N.Y. Life Ins. Co.*, 369 F.Supp. 308, 315 (D.Nev.1973) (applying Nevada law), *aff'd.* 530 F.2d 841 (9th Cir.1976); *Larson v. Occidental Fire & Cas. Co.*, 79 N.M. 562, 446 P.2d 210, 212 (1968); 16C *Appleman, supra* 9261, p. 407 *et seq.* and cases collected therein. I believe it also reflects the position Colorado courts would take on the matter.

In particular, I rely upon *Simpson v. Miller National Ins. Co.*, 175 Colo. 196, 486 P.2d 12, 14 (1971), wherein the Colorado Supreme Court held that the insurer's retention of premiums after the loss had occurred and where liability was steadfastly denied, whether dealt with as a matter of waiver or of estoppel, required a showing of reliance by and prejudice to the insured, quoting language to that effect from *Goorberg v. Western Assurance Co.*, 150 Cal. 510, 89 P. 130 (1907). Although *Simpson* does not deal with the precise issue involved here, it does in my judgment

reflect the fact that the Colorado courts—like those of Missouri and other states—require a showing of at least some prejudice to an insured in connection with any argument that the insurer has, by virtue of arguably inconsistent conduct or statements, foreclosed itself from asserting valid defenses to liability.

 The facts here indicate that at the time of the letter declining coverage, Scheall was represented in these proceedings by counsel retained by his principal, American Auto Shippers, or by his principal's insurer, Commercial Union Insurance Co. It is likewise apparent that these attorneys did not withdraw and thereby permit judgment to be taken against Scheall, until he had entered into a contract with the plaintiffs, forever protecting him from personal levy and execution. There is no evidence that he personally bore the costs associated with any defense against plaintiffs' claims, or that he has expended any sums attempting to establish his alleged rights against Mission. Absent any such showing, I believe that plaintiffs have failed as a matter of law to show that Scheall was prejudiced in any fashion by the fact that Crossley's letter of January 4, 1983 declined coverage only on the basis of a "flat" cancellation.[16] I thus conclude that Mission is not estopped to assert the policy defenses in question.

### I.

*May Daniel Paul Newman, Despite the Driver Exclusion Endorsement, Be Treated As a "Covered Driver" Under the Guaranty Policy, And Hence Under the Bellefonte And Mission Policies, Under Any of the Following Theories: (1) Waiver or Estoppel (2) Policy Ambiguity; or (3) The Doctrine of Reasonable Expectations?*

Paragraph 4. of the "Exclusions" section of the Mission policy incorporates by refer-

ence all of the exclusions contained in the Guaranty and Bellefonte policies. One of those exclusions is the "Driver Exclusion" endorsement appended to the Guaranty policy. Mission asserts that since Newman was not among the covered drivers designated therein, he is accordingly excluded from Mission's coverage. Plaintiffs argue that the Guaranty and Bellefonte coverage, and in turn Mission's coverage, should nonetheless be taken as extending to Newman, despite that Driver Exclusion endorsement, under any one or more of three theories: (a) waiver or estoppel; (b) the doctrine of "reasonable expectations;" or (c) policy ambiguity.

Although, as indicated, I do not believe this court has any authority to adjudicate the liability of Guaranty or Bellefonte on their policies, as such, the present question is in fact addressed to Mission's policy itself, albeit if only to its incorporation by reference of the exclusions of the Guaranty and Bellefonte policies. I have no hesitancy addressing the matter in that context, although I stress that my rulings on these points cannot and do not bind Guaranty and Bellefonte.

### 1.

### *Waiver and Estoppel*

 The short answer to plaintiffs' suggestion that Mission, by virtue of Crossley's failure to assert the matter in his letter of January 4, 1983, has waived or is estopped from asserting Newman's non-coverage, is that the terms of that clause rather clearly pertain to *coverage*, as such, see, e.g. *Mid-Century Ins. Co. v. Liljestrand, supra,* and may not be expanded or varied by theories of waiver or estoppel based upon something such as Crossley's letter. *See Hartford Livestock Ins. Co. v. Phillips, supra;* 16 B *Appleman, supra,* § 9090 and cases cited therein. Nor for that matter, given the discussion in Point H. hereof, would the facts of this case

16. Even if the Colorado courts require no higher standard for prejudice than the Missouri courts, the insured here has not even undergone the "slight degree of prejudice" which would

have been occasioned by an action against the insurer to determine his rights. *Morris v. Reed, supra.*

support a waiver/estoppel theory of that nature even if the Driver Exclusion endorsement was theoretically subject to such an argument.

### 2.
### Conflicting or Ambiguous Policy Provisions

Plaintiffs' first argument in this connection relates to the fact that the *application* for the Mission policy, as submitted by Mooney, asserts that the underlying policies do *not* contain restrictive endorsements. Plaintiffs suggest that a policy application must be considered as part of the total insurance contract, and that when this answer in the application is laid beside paragraph 4. of the policy Exclusions—which undertakes to make Mission's coverage subject to all exclusions contained in the underlying policies—an ambiguity is created, which must in turn be resolved in favor of the insured.

■■■■ It is true that where an insurance application is attached to, incorporated by reference or otherwise made a part of the policy as issued, it and the policy must be read and construed together as related parts of a single contract, in order to ascertain the intent of the parties. *See* 13A *Appleman, supra* § 7582. On the other hand, where—as here—the application is *not* attached to or in any other way made a part of the policy, the rule is generally otherwise, *see* 13A *Appleman, supra* § 7575, although one Colorado case might be read as suggesting the contrary, *see Sun Fire Office v. Wich,* 6 Colo.App. 103, 39 P. 587, 589 (1894). In any event, the greater difficulty with plaintiffs' argument lies in the fact that when there is a conflict between the application and the policy provisions, the terms of the policy are ordinarily considered to govern. *North American Acc. Ins. Co. v. Anderson,* 100 F.2d 452, 454 (10th Cir.1938) (applying Colorado law); *New York Life Ins. Co. v. Tolbert,* 55 F.2d 10, 12 (10th Cir.1932) (apparently applying Colorado law); *and see generally* 13A *Appleman, supra* § 7583. This is simply a reflection of the general theory, *see First* *National Bank v. Farmers New World Life Ins. Co.,* 455 S.W.2d 517, 523–24 (Mo. App.1970); 3 *Corbin, Contracts,* § 549 (1960), which treats conflicts between the various added parts of an integrated insurance contract (application, policy, endorsements, riders, etc.) as controlled by the later integrated document. *See,* e.g., *Martinez v. Hawkeye-Security Ins. Co., supra* (where endorsement conflicts with policy, endorsement, being the later expression of intent, controls).

Plaintiffs counter with a citation to *Mathew v. Ranger Insurance Company,* 281 So.2d 345 (Fla.1973). There, the application *and* some portions of the policy itself indicated that coverage was to extend to student pilots. Another section of the policy, however, specifically excluded such coverage. In ruling the matter in favor of the insured, the court stated, *l.c.* 349:

> "In granting weight to the provisions of the application, we are cognizant of the general rule allowing the provisions of the policy to govern where conflict exists between the provisions of the application and the policy ... However, that general rule is qualified where reliance on the provisions of the application would result in greater indemnity."

As may be seen, the factual situation in *Mathew* is clearly distinguishable from that here. Plaintiff's reliance upon the case is thus, in essence, simply a reliance upon the general theory expressed in the last sentence quoted above.

■■■ Whether the Colorado courts would accept that general theory is unknown. Even if they were to do so, however, I do not believe they could or would apply it to the present sort of case. The application here itself states that it is for an "umbrella or excess liability policy," and identifies the underlying policies. In those circumstances, it makes no sense to construe a simple representation by the insured, regarding the lack of restrictive endorsements in those underlying policies, as somehow excluding Mission's ability to incorporate and rely upon such endorsements

*if* in fact they *do* exist. To suggest otherwise is to suggest that the parties intended to create a situation whereby Mission's coverage would extend to risks not covered by the underlying insurers—something entirely foreign to the whole tenor of Mission's policy, and indeed to the entire insuring scheme involved here.

Nor, to deal with the matter on a more conventional basis, do I find anything ambiguous or inconsistent between the representation in the application and the existence of paragraph 4. of the policy exclusions. The statement in the application is nothing more than a representation of fact. I am unaware of any theory or rule which would prevent an insurer from relying upon a policy provision which, in effect, undertakes to address the situation that might exist if the representation should prove untrue—as it did here.

■ Plaintiffs' second argument pertains to Endorsements A 798 and A 970 to the Guaranty policy, both a part of the policy as originally issued (*see* Declarations page). Plaintiffs suggest that the statement in A 798, to the effect that "any auto you don't own *while driven with the plates described in this endorsement* [transit plates] is a covered auto ...," should, in essence, be taken as creating a conflict or at least an ambiguity when read together with the Driver Exclusion endorsement (A 800) (also a part of the policy as originally issued). In similar fashion, plaintiffs urge that Endorsement A 970, in its definition of "insured" ("You are an insured for any covered auto"), conflicts or creates an ambiguity when read in conjunction with the Driver Exclusion endorsement.

Although the common practice of adding printed form endorsements, one atop the other, to help make up the basic policy is apt to lead to questions of the present sort, I do not find any real ambiguity or conflict of the nature plaintiffs suggest here. Endorsement A 798, taken together with the rest of the policy, is simply a designation of the vehicles which will be covered by the policy. It does not stand alone in defining the policy's coverage, since the insurer's responsibility to pay is also limited by the definition of the word "insured"—that is, to sums which the *insured* becomes responsible to pay by virtue of an accident resulting from the "ownership, maintenance or use of a *covered auto* " (Guaranty Policy, Part IV.A.1.) (emphasis added). In other words, neither the definition of "covered auto" nor the definition of "insured" functions separately to establish the scope of coverage; each is a separate limiting component thereof, and both must be read together to ascertain that scope of coverage. *See generally, Mid Century Ins. Co. v. Liljestrand, supra.* There is nothing conflicting or ambiguous in this—it is the way in which automobile liability policies are customarily written. Endorsement 800 —the Driver Exclusion endorsement—in turn does no more than limit coverage, although in the process it actually clarifies what might otherwise in fact have been an ambiguity in the policy's definition of "insured," as applied to Scheall's business.[17]

A similar observation may be made with respect to the interplay between Endorsement A970 and the Driver Exclusion endorsement. The former document—a printed form in its entirety—does repeat,

---

**17.** As may be noted, the "named insured" in the Guaranty policy is "John J. Scheall d/b/a SCHEALL DRIVEAWAY SYSTEM" (*see* Declarations page). The word "you," as used in the definition of "insured" set forth in Part IV. D. of the policy, and paragraph B. D. 1 of Endorsement A970 ("You are an insured for any covered auto"), is in turn defined to mean the "named insured" described in the declarations. The omnibus features of the "insured" definition *do* extend that definition to a number of other categories of persons. None of those *other* named categories of persons, however, would include a driver of one of the autos covered by the policy (those not being autos which Scheall owned, hired or borrowed, etc.). Accordingly, as matters would stand *without* the Driver Exclusion endorsement, there is to me an ambiguity with respect to whether "John Scheall d/b/a SCHEALL DRIVEAWAY SYSTEM" refers only to John Scheall personally, or instead to the business and its various employees. The Driver Exclusion endorsement removes that ambiguity by making clear just which drivers the policy will extend to.

verbatim, that part of the original definition of the word "insured," mentioned above, which might have created an ambiguity problem. The obvious purpose of attaching A970, however, was to add several *other*, subsidiary clauses regarding the definition of "insured." Those new clauses do not themselves create any conflict with the Driver Exclusion endorsement, and are otherwise of no moment here. In the circumstances, the only rational conclusion is that the Driver Exclusion endorsement simply continues to limit coverage, and in the process to clarify any potential ambiguity with respect to the repeated portion of the definition of "insured," just as it did with respect to the language as originally used. To hold otherwise, it seems to me, would indeed be to "force" an ambiguity where none need be found.

As a final point in connection with these things, plaintiffs note the jury's express finding, in answer to Special Verdict 1, that "a reasonable person reading [all] the ... policies [would] believe that the Mission ... policy afforded coverage to John Scheall for liability because of the conduct of all of his professional drivers ...." With the greatest of respect for the very able jury which sat in this case, however, I am forced to note that any question regarding interpretation of these policies is a question of law for the court to resolve. *Ohio Casualty Ins. Co. v. Guaranty National Ins. Co., supra.* My own conclusion is that there is nothing conflicting or ambiguous between the Driver Exclusion endorsement and any other section of the Guaranty policy, or any other endorsement thereto.

### 3.

#### *"Reasonable Expectations"*

Generally speaking, the doctrine of "reasonable expectations"—in the sense referred to by plaintiffs here—is applied (by those courts which recognize it) to the nonnegotiated portions of insurance policies

and other contracts which might generally be considered instruments of adhesion.[18] Its thrust is to set aside the older ambiguity/non-ambiguity test for determining the meaning or efficacy of a particular non-negotiated term, and instead to inquire what the "objectively reasonable expectations" of the adhering party might have been on that subject, given the totality of the transaction and the circumstances surrounding it. *See generally Estrin Construction Co., Inc. v. Aetna Casualty & Surety Co.,* 612 S.W.2d 413 (Mo.App.1981).

The jury in the present case was presented with a special verdict which addressed the question of Scheall's "reasonable expectations," given the totality of the circumstances, as to whether *all* of his drivers were covered under the Mission policy. The jury answered the question affirmatively (Special Verdict 2.).

Whether the Colorado courts would accept the doctrine of reasonable expectations is open to question. Contrary to plaintiffs' suggestion, neither *Hartford Insurance Group v. District Court for the 4th Judicial District,* 625 P.2d 1013 (Colo. 1981), nor any other Colorado case I have been able to locate, clearly appears to have done so. Even assuming Colorado would find the doctrine acceptable, however, and apply it as do the Missouri courts, I believe I must reject its application here, and in the process set aside the jury's finding on the subject as a matter of law.

As applied to the Mission policy *itself,* the question is whether the existence of paragraph 4. of the policy exclusions—which incorporates any restrictive endorsements in the underlying policies—can in any sense be taken as contrary to Scheall's "reasonable expectations" for the policy. Viewed in that fashion, I do not believe reasonable minds could differ. As pointed out in Subpart 2. above, Scheall's statement in the policy application, regarding

---

18. In a broad sense, of course, all contracts—negotiated or non-negotiated—are subject to interpretation by reference to the parties' "reasonable expectations." With respect to negotiated contracts, or negotiated portions of contracts,

however, the concept finds expression simply in the ordinary rules of contract construction and interpretation. *Spychalski v. MFA Life Ins. Co., infra.*

the lack of restrictive endorsements in the underlying policies, was simply a representation of fact. He could not have, in my view, any reasonable expectation that Mission's policy would fail to include a provision dealing with the situation which would exist if that fact were not so.[19]

█ Despite all the above, however, given the jury's obvious acceptance of Scheall's testimony concerning his meetings with Mooney, one might perhaps still salvage something for plaintiffs here, *if* Mooney was acting as Mission's agent at that time. It is familiar doctrine that an insurance company will be estopped to take advantage of a policy condition or coverage limitation which it or its agent has misrepresented (either innocently, negligently or intentionally) to the insured, or where the insurer's agent has failed to obtain coverage of the sort the insured requested, at

least when the insured's purposes in applying for the insurance would be frustrated thereby. *See generally* 16B *Appleman, supra* § 9090 at p. 592–99. And in fact the jury specifically found that Mooney was acting as Mission's agent at the time the policy here was negotiated and delivered (Special Verdicts 12.A. and 12.B). Unfortunately, however, I must again set aside that finding, as a matter of law, based upon the clear mandate of § 10–2–203 of the Colorado Revised Statutes.[20]

That statute reads as follows (emphasis added):

"(2) Every insurance broker ... who solicits an application of insurance of any kind *shall be regarded as representing the insured or his beneficiary and not the insurer in any controversy* between the insured or his beneficiary and the insurer issuing any policy upon such application ..."

---

**19.** In a broader sense, of course, the question might be taken to be whether, in the totality of the circumstances, Scheall had a "reasonable expectation" that the underlying policies, *and in turn the Mission policy,* would provide coverage for all of his drivers. In actuality, this addresses Scheall's "reasonable expectations" for the Guaranty policy. Even there, however, I doubt that the doctrine—in its commonly understood form—could be applied.

The rule, in the sense dealt with by plaintiffs, concerns only the *non-negotiated* portions of a contract. Where, as in the instant matter in connection with the Guaranty policy, the dispute concerns the application or interpretation of a provision which has been specially and individually prepared for the contract (or perhaps even where the provision *is* simply a printed form provision, if both parties have had a meaningful opportunity to exercise a choice in the matter), the doctrine has no application, as such, and the dispute will be resolved by the usual rules of contract interpretation. *Robin v. Blue Cross Hospital Services, Inc.,* 637 S.W.2d 695, 697–98 (Mo. banc 1982); *Spychalski v. MFA Life Ins. Co.,* 620 S.W.2d 388, 393–94 (Mo.App. 1981). Tested by those latter rules, *see NIKA Corp. v. The City of Kansas City,* 582 F.Supp. 343, 350–51, 354 n. 4 (W.D.Mo.1983); *Spychalski v. MFA Life Ins. Co., supra* at 394, the Driver Exclusion endorsement at issue here must obviously be given effect as written. It is clear and unambiguous; and even if one proceeds past that point to consider other matters, including the intentions of the parties, it must still be construed in favor of Guaranty. As stated in *Restatement (Second) of Contracts* § 201 (1981),

where the parties have "attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made ... that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party." Given the application submitted by Scheall, that test clearly would lead to a resolution of matters in favor of Guaranty. In fact, the real question plaintiffs raise here is not related to an "interpretation" of the endorsement, as such, but rather to the fact that it appears as a part of the policy at all. To put it shortly, if Scheall failed to obtain the coverage he wished, it is at least through no direct fault of the Guaranty underwriters, who simply supplied that which the application requested.

**20.** There is evidence that Mooney was—in contrast to his arrangement with Mission—a licensed agent for *Guaranty* at the time the Guaranty policy was negotiated, issued and delivered. How this might affect an estoppel argument of the nature mentioned above, as against *Guaranty* with regard to the Driver Exclusion endorsement, is something beyond the scope of this opinion, given Guaranty's absence as a party and the fact that the issue has not been raised or briefed in any event. Nor, in the circumstances, do I undertake to deal with how Colo. Rev.Stat. § 10–2–203(1) *might affect that situation,* although I note that it makes an insurance "agent" the agent of the *insured,* just as § 10–2–203(2) does with respect to an insurance "broker."

This language is clear and unambiguous, and in my judgment controlling.

Plaintiffs suggest that the statute, being simply a part of a larger statutory compilation dealing with the licensing and regulation of insurance brokers and agents, was not intended to change the common law of agency. In that connection, they cite *Granite State Fire Ins. Co. v. Mitton*, 98 F.Supp. 706 (D.Colo.1951), *aff'd.* 196 F.2d 988 (10th Cir.1952), and note the comment therein, *l.c.* 710, that such statutes "do not destroy the power of the courts to infer an agency relation from the conduct of the parties."

■ Appealing as plaintiffs' arguments might be, I cannot accept them here. It is a basic tenet of statutory construction that a court must look first to the language of the statute, and if that language is plain and unambiguous, enforce it as written. *Kananen v. Matthews*, 555 F.2d 667, 670 (8th Cir.1977); *Colorado Public Interest Research Group v. Train*, 507 F.2d 743, 746 (10th Cir.1974). Here, the statute specifies that an insurance broker—which Mooney admittedly was as concerns Mission—[21] "who solicits an application for insurance ... shall be regarded as representing the *insured or his beneficiary*" (emphasis added), and lest there be any doubt as to the legal import of that, expressly states that the broker "shall *not* [be regarded as representing] the insurer in any controversy between the insured or his beneficiary and the insurer" (emphasis added). The mere fact that the statute appears among a group of statutes dealing with licensing and regulation of brokers does not permit me to ignore its clear language and obvious intent. Nor can I find any conduct by the parties here, in reference to the solicitation, negotiation and issuance of the Mission policy, which could override the statute even if that were theoretically possible.

■ I note, in this latter respect, that *Granite State* dealt with the actions of an agent or broker *after* the issuance and delivery of the policy, and that the language quoted by plaintiffs was not directed even to that problem, but instead dealt with whether the fact that the agent was not licensed would prevent a finding of common law agency. I have no doubt, as *Granite State* holds, that once a broker has secured a policy, which has been accepted by the insured, the broker's status as an agent for the insured may terminate, and that he may thereafter, as evidenced by the conduct of the parties, become the agent of the insurer for other matters connected with the policy. It is for this reason, given the policy's directions and the parties' conduct, that I have no difficulty accepting the jury's finding (Special Verdict 5) that Mooney was acting as Mission's agent for purposes of receiving notice of loss under the policy.[22] That is not, however, the point presently at issue. In connection with the solicitation and negotiation of the Mission policy, there is simply no showing that Mooney acted in any other capacity than as an independent broker. In those circumstances—regardless what agency status the common law might dictate for him (and, in fact, it appears the Colorado common law might also treat him as the *insured's* agent, *see Granite State, supra* )—the statute here must control.

## IV.

## CONCLUSION

The conclusions of law reached in the preceding sections make two points apparent: (a) that Mission is not barred, under the doctrines of waiver, estoppel, "reasonable expectations," or policy ambiguity or

---

**21.** A companion Colorado statute defines a "broker" as an individual "who, for compensation, not being a licensed agent for the company in which a policy of insurance is placed, acts or aids in any manner in negotiating contracts of insurance or placing risks or effecting insurance for a party other than himself." Colo.Rev.Stat.

§ 10–2–202(2). Whatever Mooney's arrangement with respect to Guaranty might have been, *see* fn. 20., *supra,* there is no evidence, or any suggestion, that Mooney was a "licensed agent" for Mission.

**22.** *See* fn. 7., *supra.*

conflict, from asserting its policy defenses related to its status as an excess insurer, the insured's failure to maintain underlying insurance coverage, the failure to establish the underlying carriers' liability, and the Driver Exclusion endorsement; and (b), that the ultimate efficacy of the second, third and perhaps fourth of those policy defenses depends upon whatever binding judgment might be rendered with respect to Guaranty and Bellefonte in connection with those matters—a judgment that cannot be rendered here, given their absence as parties.

Given the court's rulings, Mission is obviously entitled to judgment on the present garnishment, as plaintiffs have postured it. For the benefit of posterity, however, I will state my belief that any such judgment will have a preclusive effect only as to plaintiffs' claims that Mission is barred, under the doctrines of waiver, estoppel, "reasonable expectations" or policy ambiguity or conflict, from asserting and relying upon the policy defenses in question. To the extent those policy defenses in turn ultimately depend upon or may be affected by a binding adjudication of the liability of Guaranty and Bellefonte, the final answer must await that adjudication. Stated otherwise, to the extent that Mission's liability is dependent upon conditions now unsatisfied, but which might ultimately be satisfied, I do not believe the present judgment would bar that liability. *See generally Restatement (Second) of Judgments* § 20(2) (1982).

## V.

## JUDGMENT

For the reasons stated, it is hereby

ORDERED that the jury's findings on Special Verdicts 1., 2., 12.A. and 12.B. shall be and are hereby set aside and held for naught; and it is further

ORDERED that judgment shall be entered in favor of Mission Insurance Company, as garnishee upon plaintiffs' judgment against John Scheall, and against plaintiffs: and it is further

ORDERED that Mission Insurance Company shall have and recover from plaintiffs its taxable costs herein incurred and expended; and it is further

ORDERED that any pending motions of the parties shall be and are hereby denied as moot.